UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CARLA VIROLA and LISA EDWARDS,

       Plaintiffs,                         MEMORANDUM
                                            AND ORDER
  - against -                                                      05-CV-5056 (JG) (RER)


XO COMMUNICATIONS, INC., JEROME
MOWERY, PAUL CRUZ, and JAKE
MARTIN,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
A P P E A R A N C E S :

    ZATUCHNI & ASSOCIATES
      1 West Street, Suite 100
      New York, NY 10004
    By: David Zatuchni
      Attorneys for Plaintiffs

    JACKSON LEWIS LLP
      220 Headquarters Plaza
      East Tower, 7th Floor
      Morristown, NJ 07960
    By: John M. Nolan
      Marjorie N. Kaye, Jr.
      Robert M. Pettigrew
      Attorneys for Defendants

JOHN GLEESON, United States District Judge:

    Carla Virola and Lisa Edwards sue their former employer, XO Communications,

Inc. ("XO"), and their former supervisors Jerome Mowery, Paul Cruz, and Jake Martin,[1] alleging

---

[1]  Gina Rea was originally named as a defendant in the action, but the plaintiffs voluntarily dismissed their claims against her on December 14, 2007.

gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), and New York Human Rights Law ("NYHRL"), N.Y. Exec. Law §§ 290-301, as well as fraudulent inducement of their employment contracts and intentional infliction of emotional distress under New York state law. The defendants move for summary judgment. For the reasons that follow, the motion is granted as to Virola's retaliatory discharge claim and both plaintiffs' intentional infliction of emotional distress claims, but denied as to the plaintiffs' remaining claims.

BACKGROUND[2]

Virola and Edwards worked for XO as sales associates. Their claims revolve around two sets of allegations. First, they claim that they were fraudulently induced to enter into their employment contracts with XO by XO's misrepresentations regarding the nature of the services XO offered its customers. Second, they claim that while employed by XO they were subject to gender discrimination taking the form of disparate treatment with respect to commissions paid and of sexual harassment creating a hostile work environment.[3] In Edwards's case the gender discrimination allegedly rose to the level of constructive discharge.[4]

A.  *XO's Network*

XO provides voice and data services to commercial customers through a fiberoptic network composed of strands of fiberglass which transmit pulses of light used as

_____

[2]    The following facts are undisputed unless noted otherwise.
[3]    The conduct underlying these claims of discrimination appears to ground the plaintiffs' claims of intentional infliction of emotional distress as well.
[4]    Virola also claimed retaliatory discharge, the sole retaliation claim in this action, but did not oppose the defendants' motion for summary judgment with respect to that claim. I grant this unopposed portion of the defendants' motion.

signals. Deposition of Steven Nocella, Jan. 31, 2007, 8, 20-21.[5] While strands in a fiberoptic network must be "lit" by electronic signaling equipment[6] in order to be useful for communication, *id.* at 23; Deposition of Randolph Nicklas, Nov. 2, 2007, 11, "dark" strands not connected to signaling equipment are still commercially valuable, as they may be leased to other entities that use their own signaling equipment to light the strands, Nocella Dep. 28; Nicklas Dep. 11-12.[7]

XO[8] was originally a local exchange carrier that provided voice and data services in a collection of independent metropolitan networks that were not connected to one another. Nicklas Dep. 8-15; Nocella Dep. 20-29. In order to tie its networks together into a "long-haul" intercity network, XO entered into a cost-sharing agreement with Level 3 Communications ("Level 3"). Nicklas Dep. 12-13, 33-34. Under this agreement, Level 3 constructed a 96-strand fiberoptic cable, granting XO ownership of 24 dark fiber strands, which were completed by the fall of 2001. Nicklas Dep. 20-21.

[5] As will be explained in more detail below, the parties dispute whether XO could be characterized as owning components of the network it utilized, but it is undisputed that XO played a role in the distribution of telecommunications services through a fiberoptic network. *Compare* Defendants' Rule 56.1 Statement of Material Facts (hereinafter Defs.' 56.1 Stmt.) ¶ 4 (describing XO as providing voice and data services through a fiberoptic network) *with* Plaintiffs' Responding Statement of Facts (hereinafter Pls.' 56.1 Resp.) ¶ 4 (objecting to the implication that XO owned the fiberoptic network); *see also* Plaintiffs' Counter-Statement of Material Facts (hereinafter Pls.' Counter-Stmt.) ¶¶ 49-51 (claiming that XO did not own components of its fiberoptic network); Defendants' Response to Plaintiffs' Counter-Statement of Material Facts (hereinafter Defs.' Counter-Resp.) ¶¶ 49-51 (objecting to plaintiffs' characterization of ownership of network components).

[6] This equipment includes both terminal equipment that sends the signals and amplifiers that act as intermediate relays to prevent the signals from deteriorating. Deposition of Randolph Nicklas, Nov. 2, 2007, 18-19, 22.

[7] A lease of dark fiber typically takes the form of an Indefeasible Right of Use ("IRU"), which grants the holder a long-term right to unfettered access to dark fiber owned by another company. Nocella Dep. 28; Pls.' 56.1 Resp. ¶ 10. The defendants claim that it is customary in the telecommunications industry to refer to fiber leased through an IRU interchangeably with fiber actually owned, Nocella Dep. 89, 107-08, but the plaintiffs disagree, Pls.' 56.1 Resp. ¶ 10; Deposition of John Donovan, Aug. 22, 2007, 94-95. This disagreement does not appear to be material to the case.

[8] XO was originally known as Nextlink, and was renamed XO Communications in the summer of 2000. Nicklas Dep. 7-8; Pls.' Counter-Stmt. ¶ 28. For convenience I will refer to it simply as XO.

XO had originally intended to light all of this fiber itself, Nicklas Dep. 25-26; Defs.' Counter-Resp. ¶ 43, but in 2001 it decided to light only part of the fiber and leave the rest of it dark, Nicklas Dep. 28-30. Instead, XO would use fiber leased from Level 3 and lit by Level 3 with Level 3's own signaling equipment to form the rest of its network, though XO still used its own electronic routers to convert the optical signals into data usable by XO's customers. *Id.* at 25, 36-39; *see also* Nocella Dep. 52-59, 90; Deposition of John Donovan, Aug. 22, 2007, 190-94.[9] Level 3 lit 100 wavelengths on this network to "OC-192" specifications. Nicklas Dep. 29-31. OC-192 is a measure of the bandwidth of a network, which determines the speed with which it can transmit data. Nocella Dep. 26-27.[10] In 2006, XO lit its entire network itself and ceased to lease lit fiber from Level 3. Nocella Dep. 46-48.

While some elements of a fiberoptic network are customarily referred to as a "backbone" in the telecommunications industry, the parties dispute exactly which ones. The plaintiffs claim that in industry parlance, an "OC-192 backbone" or "OC-192 IP backbone" refers to the fibers, the signaling equipment used to light the fibers, and the routing equipment used to translate the optical signals into usable data. Pls.' Counter-Stmt. ¶ 39; Nicklas Dep. 22-24. The defendants claim that a network of fibers and signaling equipment is called a "transport backbone" or "transmission backbone," Nicklas Dep. 22-23, but that the terms "OC-192 backbone" and "IP backbone" refer only to the routing equipment and not the fibers or signaling equipment, Nocella Dep. 90-91, 100, 102-03. This dispute is critical in determining whether

---

[9]     The defendants argue that Donovan's testimony and report should be struck from the record because he has not been "deemed an expert by this court." Defs.' Objections to Pls.' Counter-Stmt. 3. To the extent that the defendants intend this to be a motion to preclude Donovan from offering expert opinions, it is denied without prejudice to renewal in a fully-briefed motion in limine.

[10]     A fiberoptic network's bandwidth depends primarily on the electronic signaling equipment and not the actual fibers. *Id.* At that time, OC-192 was the typical bandwidth for intercity networks. Nicklas Dep. 33.

XO's representations regarding its facilities, which often referred to XO's "backbone," were false.

XO made a number of representations that the plaintiffs claim indicated that XO lit its own network as opposed to leasing lit fiber from Level 3. XO's 2000 annual report stated, "[W]e deliver [services] over our own facilities-based network. Why? Because having our own network allows us to control service from one end to the other." Zatuchni Cert. Ex. K. The report also stated that XO's recent addition of wireless capabilities to its local fiber networks extended its network reach and improved its "ability to quickly and cost-effectively access more customers -- without the need for third-party facilities," *id.*, and went on to indicate that XO was linking its metropolitan networks to each other with long-haul fiber connections, *id.*

In 2001, XO made following claims on its website: "XO has an OC-192 IP backbone with OC-12 uplinks in our markets and data centers; that means we have one of the highest capacity and scalable IP backbones in the industry"; "The XO OC-192 IP backbone runs completely across its own Inter-city facilities"; and:

> XO has deployed an OC-192 (10 Gbps) network using Dense Wavelength Division Multiplexing (DWDM) routing technology. This Inter-city network spans 16,000 route miles across the continental United States. The extensive reach of the XO fiber network affords XO the unprecedented ability to manage customer data from the point of access to the point of termination. Owning such a vast network facility gives XO the power to:
> - scale immediately to meet customer demand
> - quickly respond to network issues and
> - control prices charged to customers.

Zatuchni Cert. Ex. J.

In its 2002 Summary Report to Customers, XO stated:

> In 2002, XO completed construction of its OC-192 IP network. This high-capacity backbone runs across its own fiber infrastructure, and connects to our local networks, serving over 60 markets and 2,300-plus on-net buildings, providing first and last mile connectivity for the XO "national-local" infrastructure. It is among the largest and fastest IP backbone networks available in the United States.
>
> An end-to-end network such as ours allows us to offer customers complete facilities-based solutions with high levels of control and security. It also means we deliver increased capacity, faster resolution of service issues and a higher quality of service than our competitors who resell capacity.

Zatuchni Cert. Ex. L. In a July 17, 2002 document distributed to its sales representatives and customers, XO stated, "XO offers innovative products, all riding on our state-of-the-art, OC-192 intercity fiber backbone -- a network robust enough to carry all the traffic of AT&T, WorldCom, and Sprint combined." Zatuchni Cert. Ex. J. Nicklas stated in his deposition that he thought "some people could be misled by" the use of the pronoun "our" to refer to the intercity backbone. Nicklas Dep. 102-03. XO also issued press releases in 2001 referring to "its national IP backbone," and "the XO high-speed fiber backbone." Zatuchni Cert. Ex. M.

Additionally, XO's website contained a map depicting XO's intercity network. Virola Cert. ¶ 24 & Ex. B. This map, though not mentioning or referring to Level 3, depicts network connections apparently identical to those depicted on Level 3's intercity network map. *Compare* Virola Cert. Ex. B *with* Virola Cert. Ex. D; *see also* Virola Cert. ¶¶ 35-36 (describing equivalence of the two maps). Virola claims that XO's engineering department maintained a map "well-hidden in XO's intranet" which refers to the network as "XO/Level 3 Long haul." Virola Cert. ¶¶ 33-34 & Ex. C.

Mowery testified in his deposition that he believed XO was leasing dark fiber and lighting it itself, Deposition of Jerome Mowery, Sep. 19, 2007, 22-23, and he agreed that "if the fiber was not lit by XO but was lit by another company, then it would not be XO's lit backbone network," *id.* at 24-25. He believed that XO was representing to its own salespeople that XO "had its own lit backbone network," *id.* at 26, and at the time of the deposition he still believed that XO had not been leasing services from Level 3 and reselling them to its consumers, *id.* at 35-36.[11]

B.   *The Plaintiffs' Decisions to Enter into Employment Contracts with XO*

1.   *Carla Virola*

In the fall of 2001, Virola was looking for work. An experienced telecommunications sales agent who had recently been laid off from Universal Access, she had several interviews for a sales agent position with rival telecommunications company Band-X, and was informally told that she would receive a formal offer from Band-X.

After her interview with Band-X, Virola at XO interviewed with defendant Cruz, as well as Cruz's manager, David Salustri. Virola alleges that at this interview Cruz stated that XO had its own fiber backbone which was about to be lit and that XO was not a reseller. Deposition of Carla Virola, Sept. 21, 2006, 164-65. At this interview, Cruz provided Virola with a hardcopy of a PowerPoint presentation as documentation that XO would be lighting its network. Virola Dep., Sept. 21, 2006, 176; Virola Cert. ¶¶ 18-20 & Ex. A. The PowerPoint presentation includes the statement: "The Fact: Today We're More Solid Than Ever . . . .

---

[11]   Defendant Cruz also testified that he believed, at the time of his deposition, that in the fall of 2001 XO's backbone was lit, but his deposition testimony does not make clear whether he believed XO was lighting its fiber as opposed to a third party. Deposition of Paul Cruz, Oct. 3, 2006, 147.

Turning up our own OC192 backbone RIGHT NOW." Virola Cert. Ex. A.

Virola alleges that she reviewed the information on XO's website, including XO's publicly-available map depicting its intercity network. Virola Cert. ¶¶ 22-25. She also alleges that she came across other articles and press releases quoting XO officers discussing the lighting of its backbone and its ability to offer competitive pricing because it owned its infrastructure. *Id.* ¶ 26. On October 8, 2001, Virola accepted an offer from XO and ceased all dealings with Band-X. *Id.* ¶ 27-28; Zatuchni Cert. Ex. Q. She alleges she did this in reliance on her research and the representations made during her interview. Virola Cert. ¶¶ 27-28. She was never informed of the service agreement with Level 3 and would not have ceased her dealings with Band-X if she had known of it. *Id.* ¶ 37-38.

2. *Lisa Edwards*

In February of 2003, Edwards applied for sales positions at several telecommunications companies. She received an offer from Universal Access and had an interview with AT&T, which she alleges went very well. Edwards Cert. ¶ 9. Edwards then interviewed with Mowery, and claims that she informed him of her offer from Universal Access and stated that she wanted to work for a company with its own fiber and facilities, not a reseller. *Id.* ¶¶ 11-12. She claims that Mowery assured her that XO had its own OC-192 backbone and that if she took a position with XO, she would be selling the company's own services and products. *Id.* ¶ 14. Edwards claims that she asked for reassurance that if she took a job with XO, she would be able to offer her customers significant savings due to XO having its own infrastructure, and Mowery responded by saying that XO's backbone made it extremely competitive and she would not have to worry about losing clients due to increased pricing. *Id.* ¶¶

15-16. Edwards asserts that Cruz joined the interview and repeated that XO had an entirely lit OC-192 backbone and was not a reseller of services, *id.* ¶¶ 18-19, and she claims that she was shown marketing materials indicating that XO had a nationwide intercity network, *id.* ¶ 21-22. Edwards states that she also reviewed XO's statements on its website, including XO's publicly-available map depicting its intercity network, and also found other articles quoting chief XO officers stating that XO lit its own backbone. *Id.* ¶¶ 28-31. Edwards accepted a job with XO on March 17, 2003, induced, she claims, by her research and the representations made to her during her interview. *Id.* ¶ 34.

3. *Office Structure*

When Virola began working in 2001, she worked for the Wholesale Carrier Division in XO's office in downtown New York. Initially, defendant Cruz was Virola's direct supervisor. In 2002, Cruz was promoted to Director of New York/New Jersey, and defendant Mowery was promoted to Cruz's old position as Virola's direct supervisor. Edwards joined the Wholesale Carrier Division in March of 2003. In November of 2003, XO's sales organization was restructured so that the division, where both plaintiffs worked, was placed under the authority of defendant Martin, who was based in Reston, Virginia. Martin reported to XO Vice President Ernie Ortega. At that point, Cruz no longer supervised Mowery and the team employing the plaintiffs, instead managing the general business and retail operations of the New York office, where the plaintiffs continued to work.

C. *The Impact of XO's Network*

The plaintiffs allege that by leasing OC-192 bandwidth services from Level 3, instead of lighting its fiber itself, XO placed itself at a competitive disadvantage compared to

carriers that lit their own fiber. Pls.' Counter-Stmt. ¶ 56. In support of this claim they offer the testimony of an expert witness, *see* Donovan Dep. 129-31 (opining that leasing was likely to have negatively impacted XO's competitiveness); an email from defendant Martin to Edwards acknowledging that XO's decision not to light its own network placed it at a disadvantage, *see* Zatuchni Cert. Ex. H ("Bottom line is that XO has not made the decision to build out its own long haul and as a result we're not as competitive as we could be."); the deposition testimony of XO's chief technical officer Randolph Nicklas agreeing with the premise of that email, *see* Nicklas Dep. 104-05 (agreeing with the email and agreeing that XO became more competitive since lighting its own network), and noting that the competitive disadvantages caused by leasing led XO to deemphasize sales of service on the leased lines, *id.* at 112-13; the deposition testimony from a vice president at XO that a business lighting its own network enjoys advantages, Nocella Dep. 74 ("[I]f you owned your own network, your business can take a lower return on your investment than if you had to purchase the network . . . ."); and Mowery's deposition testimony that resellers of a service are at a disadvantage compared to those who own their own network, *see* Mowery Dep. 103-04 ("[I]f you are a reseller, you are at a competitive disadvantage. As a facilities based owner of a network, you certainly have advantages over those that aren't.").

The plaintiffs further argue that it is important for a salesperson to know whether a prospective employer lights its own network or contracts for a third party to light its network. They point to deposition testimony from Mowery and Nicklas to that effect. *See* Mowery Dep. 105 (agreeing that this information is important to a prospective employee and it would be wrong for a prospective employer to misstate it); Nicklas Dep. 114 ("[I]t is a shared responsibility

between the employees and management to make sure that they know what they are going to be more successful at selling and why.").

Virola and Edwards argue that they each lost several sales due to XO's inability to provide the requested service, which they claim was due to XO's failure to have its own lit OC-192 backbone. Virola claims that a contract she made with Global Naps fell through when XO was unable to install the contracted-for fiber ring in time. Virola Dep., Dec. 19, 2006, 204-05. Virola claims that this was due to the fact that XO was leasing OC-192 service from Level 3, which imposes delays in new installation. *Id.* at 205-06. She made a second deal with Global Naps, which Global Naps canceled due to delays. *Id.* at 201, 208, 234-35. Virola believes that the delays were created by XO's leasing of OC-192 service from Level 3. *Id.* at 235-36. Virola made a third deal with Global Naps, which failed due to a lack of conductivity at the building, which Virola believes is also due to XO's leasing of OC-192 service from Level 3. *Id.* at 241-44. Virola claims that her contact with the Global Naps acknowledged that Virola fulfilled her role at all times and was concerned that Virola was not receiving compensation for the work she performed on the canceled contracts. *Id.* at 244-45. Similarly, Virola claims that 12 or more contracts with a different client, Dollar Phone, *id.* at 247, and contracts with additional clients Arbinet and Aldea Vision, *id.* at 269-70, 296-97, were cancelled due to XO's lack of its own OC-192 service.

Similarly, Edwards claims that a contract with the client Sakon was canceled because XO did not have lit fiber in the required area. Deposition of Lisa Edwards, Sept. 19, 2006, 40-43. She also claimed that a contract with a customer Dialmex failed because XO did

not have a diverse network[12] in the area, as Edwards had been led to believe by XO's engineers. *Id.* at 50-54. Edwards additionally believes that Transcom, Global Communications, Dollar Phone, Pilosoft and Interoute also did not receive appropriate services due to misrepresentations XO made, though she did not specify what type of misrepresentations. *Id.* at 58-59.[13]

D.    *Alleged Gender Discrimination*

1.    *Alleged Disparate Treatment Regarding Commissions and Client Accounts*

Virola and Edwards both worked in XO's New York sales office, where they claim they experienced several forms of gender discrimination. They claim that they experienced various problems with receiving commissions, and that they spoke to male coworkers who stated they never had problems getting paid their commissions. Virola Dep. 136-37. The plaintiffs produce as evidence an email sent by a Kevin Dwyer, sales manager of the New York and New Jersey offices, saying, "You guys need to get together and demand it [*i.e.*, better terms of payment]. Because, you and I both know, you [sic] commission structure isn't as good as ours." Zatuchni Cert. Ex. QQ. The plaintiffs argue that Dwyer was referring to the difference between commission structures for male and female employees, but the context does not make this interpretation inescapable.

Virola complained of several irregularities regarding her receipt of commission payments. She objected to an unexplained charge-back reducing the amount of her commission in January of 2003. Zatuchni Cert. Ex. RR. Virola also repeatedly complained that her sales performance was being calculated incorrectly for the purpose of a competition awarding prizes

---

[12]    *I.e.*, a network with redundant lines of fiber to maintain service in case one fails. *Id.* at 50-51.
[13]    Additionally, the client American Fiber Systems did not close on a deal for dark fiber because XO did not have any dark fiber in the area. Deposition of Lisa Edwards, Aug. 13, 2007, 285.

for sales representatives that exceed their sales quotas.  *Id.*

Virola claims that she complained about receiving a commission late in 2003, while a more recently-hired male sales representative, George Casazza, received his commission more quickly.  Virola Dep., Dec. 19, 2006, 309-11.[14]  She alleges that Mowery, her supervisor, did not respond to her complaints about receiving her payment late.  *Id.* at 312.  Virola claims that she spoke to Cruz regarding this, and Cruz said "you are a female and you are lucky to get what you have gotten thus far," *id.*, and also stated that he would replace her if she ever complained again about the disparity between males and females in receiving commissions, *id.* at 313-14.  She also claims that on a different occasion, Cruz stated that women did not get paid the same as men was because they were "broads"  and always encounter a glass ceiling, and he advised her to content herself with the money she was making.  Zatuchni Cert. Ex. JJ.  Edwards also claims that she received commissions late, and complained about this.  Edwards Resp. to Interrogs. No. 7, Zatuchni Cert. Ex. S.

In addition to claims that their commissions were paid late, both Virola and Edwards claim that they were effectively deprived of commissions altogether on several accounts.  Virola claims that XO improperly canceled deals with Dollar Phone, depriving her of commissions.  Virola Dep., Dec. 19, 2006, 247-49.  The defendants claim that the Dollar Phone deals were canceled due to the risk of liability for violating FCC regulations regarding access fees, Deposition of Ernie Ortega, Oct. 11, 2007, 41-44, but Virola claims that other clients who behaved similarly were being treated differently.   Virola Dep. 246-54, 263-66.   Virola also

---

[14]        She claims that she complained about this in an email, but this message is not part of the record before me.

claims that the Dollar Phone account was taken away from her in April of 2004 and made a corporate account. Zatuchni Cert. Ex. U.

Both Virola and Edwards claim that they were subject to discriminatory treatment in that client accounts were repeatedly transferred from them to male sales representatives. Virola claims that she was improperly removed from accounts with Arbinet, Virola Dep., Dec. 19, 2006, 269-76; ComCast, *id.* at 276-81; DOITT, *id.* at 281-84; Light Wave Communications, *id.* at 286-91; Vonage, *id.* at 306-09; Pier 1, *id.* at 328-29; and Looking Glass, Virola Resp. to Interrogs. No. 17, Zatuchni Cert. Ex. O, all of which were subsequently given to male representatives. She also claims that although she performed the work in closing a deal with Telephonics, Casazza received commission on this account instead of her when she took disability leave. Virola Dep., Dec. 19, 2006, 302-04.

Edwards claims that she was improperly removed from accounts with Transcom, Edwards Dep., Aug. 13, 2007, 327-31; Pilosoft, *id.* at 348-52;[15] T-Systems, Edwards Dep., Aug. 13, 2007, 357-61; and USA Digital, *id.* at 434-42, all of which were subsequently given to male representatives.[16] Edwards also asserts that XO prevented her from securing deals with clients Sakon, *id.* at 398-400; Global Communications, Edwards Dep., Sept. 19, 2006, 181-82; and Dollar Phone/Radiant, *id.* at 145-46, by denying her the authority to offer favorable rates to the customers, rates which XO then authorized for male representatives, allowing them to close the deals instead of her. Edwards alleges that she was denied a commission for a deal she closed

---

[15]    The defendants claim that Pilosoft was transferred to the Florida team because it was an existing account and the customer requested the transfer. Deposition of Jake Martin, Apr. 27, 2007, 101-03.

[16]    She also complains that she was removed from the Wavecrest account shortly before she closed a deal with Wavecrest, and that the Wavecrest account became a corporate account. *Id.* at 462-64.

with Net Service shortly before she left XO, and that Casazza received her commissions on this sales after Edwards left. Edwards Dep., Aug. 13, 2007, 393-96.[17] She also claims that Casazza mocked her for this. Edwards Dep., Sept. 19, 2006, 9-10, 17.[18]

### 2. *Alleged Hostile Work Environment and Constructive Discharge*

In addition to this alleged disparate treatment regarding commission payments and the reassignment of client accounts, Virola and Edwards each allege sexual harassment constituting a hostile work environment. The plaintiffs claim that one component of this hostile work environment was sexual harassment and retaliation directed at their coworker Catherine Fitzmaurice. In November of 2002, Fitzmaurice made two complaints to Mowery about coworker Dennis Byrne for allegedly making frequent remarks and jokes about sex and genitalia. Zatuchni Dep. Ex. EE. Mowery spoke to Byrne and told the male members of the sales team that a female was complaining about their language, but he did not follow XO's policies regarding sexual harassment, which required him to bring the complaints to the attention of Human Resources ("HR"). After the meeting, male sales representatives cursed at Fitzmaurice in retaliation for her complaint, leading Fitzmaurice to complain to HR, which verified her complaints after an investigation. Zatuchni Cert. Ex. EE.

After HR's initial investigation, Fitzmaurice complained to HR that Cruz told her

---

[17] The plaintiffs claim that Edwards in her deposition testified that the same sequence of events occurred with respect to the clients Telephonics, *id.* at 464-65; Access Point, *id.* at 465-66; and DDC, *id.* at 466-67, but these pages of her deposition transcript are missing from the record.

[18] In their depositions, both Virola and Edwards each testified that they believed they were entitled to commissions on certain categories of sales that were not consummated. Virola Dep., Dec. 19, 2006, 222, 229; Edwards Dep, Aug. 13, 2007, 445. They have withdrawn these claims, however. *Compare* Defs.' 56.1 Stmt. ¶¶ 217, 219, 222, 225, 228, 231, 236, 240, 244, 247, 252, 256, 259, 264, 267, 270, 273, 276, 279, 281, 283, 285, 287, 289, 291, 293, 295, 297, 299, 303 (indicating that plaintiffs maintained these claims) *with* Pls.' 56.1 Resp. ¶¶ 217, 219, 222, 225, 228, 231, 236, 240, 244, 247, 252, 256, 259, 264, 267, 270, 273, 276, 279, 281, 283, 285, 287, 289, 291, 293, 295, 297, 299, 303 (denying).

that HR had showed him the interview notes, leading her to feel that the investigation was not being kept confidential. Zatuchni Cert. Ex. EE. In a meeting convened to respond to that latest complaint, Cruz told HR that Fitzmaurice had misunderstood him. *Id.* Byrne was ultimately terminated. Mowery acknowledged in his deposition that he should have been "more severe" with Byrne initially. Mowery Dep. 56-57.

Virola claims that she observed continued retaliation against Fitzmaurice for several months, even after Byrne's termination, including males calling her a "bitch," and on one occasion a male remarking, "that's what she gets for not playing by our rules." Virola Dep., Sep. 21, 2006, 32-33; Virola Cert. ¶¶ 42-50. Edwards claims that as soon as she started working at XO, she observed male sales representatives being disrespectful towards Fitzmaurice and calling her offensive names for several months, and that she learned that this was in retaliation for Fitzmaurice complaining of sexual harassment. Edwards Cert. ¶¶ 36-40.[19]

Virola and Edwards each complain of sexual harassment directed specifically at them. Virola claims that Mowery constantly told her he thought she was beautiful, Virola Dep., Sept. 21, 2006, 117; asked her to leave her boyfriend for him, *id.* at 117, 119-20; repeatedly had Virola work with him in his office with the door closed for no legitimate business purpose, where he stared at her and said he liked to look at her, *id.* at 68-69, 119, 129. Virola claims that Casazza at one point remarked that Mowery had been staring at her at a lunch. *Id.* at 123. At one point Mowery allegedly remarked to Virola that he envied Casazza because Casazza

---

[19] The plaintiffs mention in their counter-statement of material facts an incident in which another female employee, Heather Cox, accused Cruz of calling her a prostitute, but there is no testimony indicating that Virola or Edwards were ever aware of this incident. Pls.' Counter-Stmt. ¶¶ 162-63. Although the defendants claim that HR investigated this email, there is no documentation of any such investigation in the record besides the email itself and a printout of a website that Cruz claims prompted his remark. Zatuchni Cert. Exs. HH, II.

regularly went to the gym and worked out with Virola during lunch hours. Zatuchni Cert. Ex. JJ.

Mowery allegedly also repeatedly asked to meet Virola's parents and take them out to dinner. *Id.* Virola claims that at one point, Mowery suggested that he and Virola fly to Rochester for a client meeting one day early so that they could have dinner, and that she feigned illness as an excuse for declining. Virola Dep., Sept. 21, 2006, at 75-76.

Virola claims that on one occasion when she was visiting a client with Mowery, she fell when she got out of the car and he said, "I saw the girls," which she took to be a reference to her breasts. *Id.* at 120-21. On that occasion, she was wearing a business suit that would not reveal her breasts if she fell or bent over. *Id.* at 121. On one occasion in response to an email about vacation time Virola was planning on taking, Mowery sent her an email saying "You must be careful of Mickey he has a history of going after little girls in short skirts." Zatuchni Cert. Ex. LL. No elaboration or further context is apparent from the record.

Starting in early 2003, Mowery authorized Virola to work out of his office and substitute for him as manager when he went on vacation. Virola claims that at one point she lost an earring in Mowery's office, and that Mowery urged Virola's coworker Michael Cardella to present it to her at her desk. Zatuchni Cert. Ex. JJ. Cardella said that Mowery had found the earring under his desk, and claimed that Virola got ahead by "sucking the boss off," which was something that he would never do. *Id.* Virola claims that while she was filling in for him, Mowery would call in and ask her to check his email, which allegedly caused her to be exposed to pornographic emails and photographs including child pornography. Virola Dep., Sept. 21, 2006, 16, 19-20; Zatuchni Cert. Ex. KK. She testified in her deposition that the pornographic images were immediately apparent due to his email client's preview pane. Virola Dep., Sept. 21,

2006, 19-20. The defendants claim that these emails were unsolicited and evaded the company's filters, which were in the process of being installed. Mowery Dep. 74-75.

Virola complained of Mowery's conduct, but claims that Cruz did not take any action. Virola Dep., Sept. 21, 2006, 125-26. Virola also claims that Cruz made inappropriate comments to her. She alleges that on December 6, 2002, Cruz sent Virola an email stating, "Kim seems to be getting larger every time I see her if you know what I mean," apparently referring to recent breast augmentation surgery undergone by Kim Pagnozzi, which was a frequent topic of discussion among the males in the office. *Id.* at 20-21; Zatuchni Cert. Ex. MM. In a group email including several employees, Virola, and Cruz, a male coworker responded to a remark that Pagnozzi's website had been taken down with, "Cruz told me! Fortunately, I heard a rumor she can be located in the online pornography circuit." *Id.*

Cruz also allegedly repeatedly told Virola that her commissions were delayed because the women in the finance department were "bitches" who didn't want to empower other women by paying them, and that the women in XO's sales department were "broads" who were "empty upstairs and good for only one thing." Zatuchni Cert. Ex. JJ.

Virola also complained that other male coworkers sexually harassed her. Dwyer sent Virola an email at 11:16 PM when she was working late from home, saying, "What are you wearing? Just kidding chicka. [sic] Go to sleep already." Zatuchni Cert. Ex. OO; Virola Dep., Sept. 21, 2006, 20. Dwyer also allegedly often told Virola, "You look good," while staring at her breasts and buttocks, causing males to joke that Dwyer was attracted to her and was upset when Virola received flowers from her boyfriend. Virola Dep., Sept. 21, 2006, 23, 27-29. Cardella allegedly said "all you women are alike" with a derogatory tone and said that all Puerto

Rican women were "good for one thing." *Id.* at 66-68. Virola claims that she reported these comments to Cruz, who did nothing to stop Cardella's behavior. *Id.* at 89. Cardella also allegedly repeatedly described his sexual activities to Virola, *id.* at 85-86; joked about repaying a professional favor she had done him with sex, Zatuchni Cert. Ex. PP; and told her in an email to "stop bsing like a womn [sic]," *id.* He also suggested in an email that the team take a visiting female colleague to a strip club. *Id.*

On one occasion, a male colleague named Mark Shear took photographs of Virola with her palmtop computer while she was bending over her desk. Nolan Cert. Ex. T. Virola claims that these photographs focus on her rear end, that Shears laughed when he took them, and that other male coworkers were present. Virola Dep., Sept. 21, 2006, 95, 115-16. Edwards heard male colleagues joking about how wide Virola's rear was in the picture. Edwards Dep., Aug. 13, 2007, 306-07.

Virola claims that a coworker named Howard Gordon emailed her a video of a man's penis becoming erect as well as a video of a woman's rear gyrating in a sexual fashion. Virola Dep., Sept. 21, 2006, 17, 61-62. Gordon also allegedly joked that Casazza should sit on Virola's chair so that she could sit on his face and he could "get [her] off." *Id.* at 63-64; Zatuchni Cert. Ex. JJ. This comment was allegedly made out of Virola's presence and relayed to Virola by Casazza. Virola Dep., Sept. 21, 2006, 63.

Edwards also claims that she was subjected to inappropriate treatment by Mowery. She claims that Mowery would frequently compliment her appearance, including stating that she had a good body and that her hair looked sexy, Edwards Dep., Sept. 19, 2006, 115-19; that Mowery told her that he would like to date her if he wasn't with his fiancée, *id.* at

120; that Mowery called her at home after hours and asked about her personal life, *id.* at 121-23; that Mowery called Edwards "crazy" and "bipolar" out of her presence, *id.* at 19; and that Mowery and Cruz told Edwards's colleagues that she could not be trusted to do anything in the workplace, Edwards Dep., Aug. 13, 2007, 510-11. Cruz also allegedly repeatedly said that XO had a glass ceiling with respect to women, *id.* at 499, and told Edwards and Virola that they were "a bunch of complaining broads," and that they "ought to be lucky [sic] to have a job," *id.* at 507.

Edwards also received personal gifts from Mowery that she claimed were not given to her fellow colleagues, such as tickets to sporting events and a spa gift certificate. Edwards Dep., Sept. 19, 2006, 115. Edwards claims that her coworkers joked that Mowery gave her these gifts instead of paying commissions that she was owed. *Id.* at 125-27.

Virola and Edwards claim that when they began to complain about this inappropriate conduct, they were subject to a pattern of retaliation. Both claim that they complained to Cruz regarding the hostile environment, and that he threatened to fire them if they continued with their complaints. Edwards Dep., Sept. 19, 2006, 96-99; Virola Dep., Sept. 21, 2006, 12-13, 30-31, 35-36, 99-100. Edwards also claims that she heard Mowery state generally that anyone who complained about sexual harassment would be gone immediately. Edwards Dep., Sept. 19, 2006, 98-99.

Virola asserts that at a team outing to Yankee Stadium in June of 2003, Cardella offered Virola a beer, and when she refused said, "Stop acting like you don't like to drink, you know you Ricans are just the same as the Niggers, you all like to drink and get high." Zatuchni Cert. Ex. JJ. She claims that Mowery was present for this comment but did nothing, *id.*, and that when she returned to the office, she informed Cruz, who stated he would contact HR, but nothing

was done, Virola Cert. ¶¶ 61-63; *see also* Rea Dep. 63-64 (indicating that Cruz did not report this complaint to HR).

In February of 2004, Mowery failed to make arrangements for Edwards when she went to a telecommunications show in Anaheim, California. Not only did she not have a place to sleep in the area, she was told she would have to pay for entrance to the show itself. Edwards entered the show by borrowing a pass from an acquaintance at the show, but was stopped by security and humiliated in front of a representative of her customer Dialmex. Defendant Martin, at that point Mowery's supervisor, was present for this encounter along with XO Vice President Ortega, but neither of them did anything to stop Edwards from being embarrassed in front of her customer. Edwards later asked Martin about the incident, and he replied, "Now you know what it's like not to play ball." Pls.' Counter-Stmt. ¶ 214; Defs.' Counter-Resp. ¶ 214. Mowery later apologized for failing to make the appropriate arrangements for Edwards' trip. Defs.' 56.1 Stmt. ¶ 204; Pls.' 56.1 Resp. ¶ 204. Edwards claims that Shear told her that Mowery's failure to make the accommodations was intentional and that Mowery laughed about it with him and said "look what happens." Edwards Dep., Sept. 19, 2006, 135-36.

In March of 2004, Virola and Edwards claim they began complaining to HR by forwarding emails regarding compensation and other issues, but they did not refer to sexual harassment explicitly.[20] Edwards claims that this omission was due to the previous warnings they had received indicating that complaining about that subject would result in termination.

---

[20] The defendants do not deny that Virola sent one such email, on March 25, 2004. Pls.' Counter-Stmt. ¶ 277; Defs.' Counter-Resp. ¶ 277; Zatuchni Cert. Ex. SS. They do, however, deny that Virola sent a second email, with Edwards copied, on March 30, 2004, despite the fact that what appears to be a printout of such an email appears in the record. *Compare* Pls.' Counter-Stmt. ¶ 278; Zatuchni Cert. Ex. SS., *with* Defs.' Counter-Resp. ¶ 278.

Edwards Dep., Sept. 19, 2006, 106-07. Virola and Edwards had a lengthy meeting with Gina Rea, the Senior Human Resources Generalist, on April 1, 2004, at which they claim they attempted to make claims of sexual harassment and discrimination but were cut off by Rea, who said she had "enough" information. Virola Dep., Sept. 21, 2006, 11-12; Edwards Dep., Sept. 19, 2006, 78. The plaintiffs allege that afterward HR called a meeting with other team members without their knowledge and made their confidential discussions public. Edwards Dep., Sept. 19, 2006, 188-91. Ortega sent an email to upper management indicating that Virola and Edwards had "become somewhat unruly" and were "in serious jeopardy of becoming an HR issue." Zatuchni Cert. Ex. TT. The plaintiffs allege that HR did not take any other remedial measures. Edwards Cert. ¶ 48.

Virola alleges that shortly after the April 1, 2004 meeting, she met with Cruz, who stated that Mowery was going to fire her for viewing his emails when he was out of the office. Virola Cert. ¶¶ 70-73. Virola states that she responded that Mowery had explicitly told her to look at his emails while he was away. *Id.* ¶¶ 71-72. She claims that the conversation intimidated her and caused her to experience shortness of breath and a racing heartbeat. *Id.* ¶ 73. Virola asserts that she had begun seeing a psychologist regularly in January of 2004 due to the stress caused by the sexual harassment she faced, but despite this treatment, the persistence of the harassment caused her mental state to deteriorate. *Id.* ¶ 74.

Virola alleges that shortly after her meeting with Cruz, Mowery called her on the telephone and shouted at her for reading his emails; he hung up when she objected that he had instructed her to read them. *Id.* ¶¶ 75-77. This interaction, she claims, led her to experience such stress that her psychologist advised her to take a leave of absence and referred her to a

psychiatrist to prescribe anti-anxiety medication. *Id.* ¶¶ 79-81.

Virola was placed on short-term disability leave and filed a lawsuit against XO in mid-May of 2004. Within approximately one month of service of the complaint in that action, Virola's disability benefits ceased. Virola advised HR that she would contest the decision to deny her disability benefits and that her physician had not authorized her to return to work. Virola claims that on August 11, 2004, Virola received a letter claiming that she was being terminated for failure to remain in contact with XO, though Virola claims that she had kept in contact with HR. Virola Dep., Dec. 19, 2006, 368. The defendants offer a letter from HR dated October 28, 2004 advising Virola that in light of her psychiatrist's testimony that she would never be able to return to XO, XO terminated her medical leave and her employment. Rea Cert. Ex. D. Virola claims that she continues to suffer from the effects of her employment with XO, rendering her unable to work in the telecommunications field, and that she has been unable to find employment in alternative fields. *Id.* at 380, 383-84.[21]

Edwards claims that after her meeting with HR, Mowery repeatedly approached Edwards at her desk in a "physically threatening manner" and glared at her for long periods of time, making her extremely uncomfortable. Edwards Cert. ¶¶ 49-50. She asserts that male coworkers told her that Mowery and Cruz were constantly talking about her and Virola, and that

---

[21] Virola claims that she cannot work effectively in a corporate environment because of the "distrust" she has "in males in that environment." Virola Dep., Dec. 19, 2006, 380. The defendants state, in their Rule 56.1 Statement, "Virola's asserted distrust of males, however, has not deterred her from posting provocative photographs of herself on her website in order to promote her singing and acting career." Defs.' 56.1 Stmt. ¶ 317 (footnote omitted). The defendants in their memorandum of law reiterate this argument and describe the photographs of Virola as "rather fetching." Defs.' Mem. Supp. Summ. J. 41. The argument is a non sequitur and the choice of words is unprofessional.

the coworkers predicted that she would be out of a job due to her complaints to HR. *Id.* ¶ 51.[22]
Edwards claims that on April 5, 2004 that she developed pain, numbness, and dizziness from a
stress-induced blood clot after being told that Mowery was making open threats about her job,
and was taken to a hospital in an ambulance. *Id.* ¶¶ 52-54; Zatuchni Cert. Exs.VV (email
regarding Edwards' removal to the hospital), WW (medical records). She claims that she
received ongoing treatment and medication for stress from an internist, who told her that she
needed to find a new job to remove the stress that had precipitated her attack. Edwards Cert. ¶¶
52-57. For this reason, and because her supervisors removed many of her accounts in what she
believed to be an attempt to interfere with her work, Edwards began a new job search and
accepted what she claims was the first job offer she received, ending her employment with XO in
August of 2004. *Id.* ¶¶ 61-63, 66.

The defendants argue that Virola and Edwards did not complain about anything
until a company policy shift in 2004 caused Mowery's entire team to enjoy a less advantageous
commission structure, Defs.' 56.1 Stmt. ¶¶ 74-75, 78-80, and suggest that this change is the true
motivation for the plaintiffs' action.

DISCUSSION

A.    *The Summary Judgment Standard*

Under Federal Rule of Civil Procedure 56(c), a moving party is entitled to
summary judgment "if the pleadings, the discovery and disclosure materials on file, and any

---

[22] The defendants note that the allegations in this paragraph appear only in a certification Edwards
executed on March 5, 2008 and did not appear in her deposition testimony, which was given substantially earlier.
Defs.' Counter-Resp. ¶¶ 306-09. To the extent that they seek to preclude these allegations on this ground, their
application is denied.

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994) ("[T]he burden is on the moving party to demonstrate that no genuine issue respecting any material fact exists." (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975))). A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*), and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)). Therefore, although a court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods. Co.*, 530 U.S. 133, 151 (2000).

However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is proper when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo*, 22 F.3d at 1223-24 (citations omitted).

25

B.       *Fraudulent Inducement of an Employment Contract*

To prove a claim of fraudulent inducement under New York law, a plaintiff must show (1) that the defendant misrepresented a material fact (2) with knowledge of the falsity of the representation and intent to defraud, (3) inducing justifiable reliance by the plaintiffs, (4) who were injured. *See, e.g.*, *Stanley v. Bray Terminals, Inc.*, 197 F.R.D. 224, 228 (N.D.N.Y. 2000) (citing cases).

1.       *Misrepresentation of a Material Fact*

A reasonable jury could conclude that XO misrepresented a material fact. There is some dispute regarding whether XO's representations regarding the status of its network are false at all, but this question is for the jury. The testimony of XO's chief technical officer Nicklas would support a reasonable jury in finding that references to an "IP backbone" or "OC-192 backbone" describe not just the routing equipment but also the fiber and signaling equipment. Nicklas Dep. 22-24. If the jury found that, it could further find XO's repeated references to its backbone, *e.g.*, Zatuchni Cert. Exs. J, K, L, M; Virola Cert. Ex. B, were false in light of the evidence that XO was leasing the fiber and signaling equipment from Level 3, Nicklas Dep. 25, 26-39.

The defendants argue that several of the representations made by employees of XO concerned XO's future actions, not present facts. *See* Virola Dep., Sept. 21, 2006, 164-65 (claiming that XO employees stated that XO was about to light its intercity network). However, the failure to fulfill a promise to perform future acts may be actionable fraud if "there existed an intent not to perform at the time the promise was made." *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994); *cf. id.* ("[A] relatively concrete representation as to a company's future

performance, if made at a time when the speaker knows that the represented level of performance cannot be achieved, may ground a claim of fraud."). The defendants argue that any inference that XO did not intend to light its own network is insupportable given that XO eventually lit its own network in 2006. Defs.' Reply Mem. Supp. Summ. J. 3-4. I disagree. A reasonable jury could find that in 2001 XO represented that it was about to light its network imminently but had no intention of doing so, only an intention of lighting its network five years later.

Further, a reasonable jury could conclude that the misrepresentation was material. The plaintiffs have produced ample evidence that owning a lit fiber network produces significant competitive advantages. Donovan Dep. 129-31; Nicklas Dep. 104-05; Nocella Dep. 74; Zatuchni Cert. Ex. H. From this, and from Mowery's direct testimony, a reasonable jury could infer that whether a prospective employer owned a lit fiber network would be relevant to a skilled sales representative's decision whether to accept employment. *See* Mowery Dep. 104 (stating that he would not work for a reseller because of the competitive disadvantages resellers suffer).

2. *Knowledge*

A reasonable jury could find that XO was aware of the falsity of its representations. While there is scant evidence that Cruz himself believed his description of XO's network to be false,[23] a reasonable jury could infer that XO itself possessed the necessary knowledge and intent. *See, e.g.*, *Rush v. Oppenheimer & Co., Inc.*, 650 F Supp 682, 684 (S.D.N.Y. 1986) (finding that a corporation could have knowledge of the falsity of its

---

[23]        Indeed, while not fully decisive, his testimony indicates if anything that he did not believe the representations were false. *See supra* note 11.

representations even when the agent making the representations did not in fraudulent inducement case); *cf. In re Dynex Capital, Inc. Sec. Litig.*, No. 05-CV-1897 (HB), 2006 WL 1517580, at *3 (S.D.N.Y. June 2, 2006) (certifying for interlocutory appeal the question whether a securities fraud plaintiff sufficiently pleads scienter if he alleges it only against the corporation and not any individual).   The evidence that misrepresented facts were emphasized in XO's promotional material, Zatuchni Cert. Exs. J, K, L, M; Virola Cert. Ex. A; that Mowery and other XO employees involved in sales were unaware of the fact that XO was leasing lit fiber from Level 3 while senior XO officers were obviously aware of the lease arrangement, Mowery Dep. 24-26, 35-36; that an engineering map concealed from the public and difficult to access by most employees specified Level 3's involvement whereas most public maps did not, Virola Cert. ¶¶ 33-34 & Exs. B, C; and that the arrangement with Level 3 was important and reflected negatively on the company, Zatuchni Cert. Ex. H; Nicklas Dep. 104-05; Mowery Dep. 103-05, could lead a reasonable jury to conclude that XO made a deliberate decision to falsely lead the public, its own employees, and prospective employees to believe that XO owned the lit fiber it was using for its network.

If it found that XO made knowing misrepresentations, a reasonable jury could further infer that the misrepresentations were made for the purpose of inducing clients and employees to rely on the misrepresented facts by choosing to do business with XO.   The defendants argue that the plaintiffs cannot prove that XO possessed the intent to induce their employment as opposed to a more generalized fraudulent intent.[24]  This is unpersuasive.  Given

_____
[24]      The defendants cite *Chill v. General Electric Co.*, 101 F.3d 263, 268 (2d Cir. 1996), and *Stamelman v. Fleishman-Hillard, Inc.*, No. 02-CV-8318 (SAS), 2003 WL 21782645,*6 (S.D.N.Y. July 31, 2003), in

the plaintiffs' testimony that these misrepresentations were made to them in their job interviews with XO, Virola Dep., Sept. 21, 2006, 164-65, 176; Virola Cert. ¶¶ 18-20 & Ex. A; Edwards Cert. ¶¶ 11-12, 14-16, 18-19, 21-22; the evidence that XO's public representations helped induce them to take the position, Virola Cert. ¶¶ 27-28; Edwards Cert. ¶ 34; and Mowery's testimony that he himself would be unwilling to work at a company without its own network, Mowery Dep. 104, a reasonable jury could infer that XO made its misrepresentations with the intent, *inter alia*, of inducing talented sales representatives to accept employment.

3.  *Justifiable Reliance*

A reasonable jury could credit the testimony of Virola and Edwards and find they were justified in relying on the representations made to them in their interviews as well as their independent research on XO's website and on other internet articles featuring quotes from XO officers. *See* Virola Cert. ¶¶ 14, 18-20, 22-25 & Ex. A; Edwards Cert. ¶¶ 11-12, 14-16, 18-19, 21-22, 28-31. Indeed, it is unclear what other research Virola and Edwards could reasonably have been expected to perform. Mowery in his deposition described calling the customers of a prospective employer and talking to engineers within the company as available methods of due diligence for a prospective sales representative. Mowery Dep. 106-07. While such efforts to unearth non-publicly-available information may be commendable, and while defendants are free

---

support of this claim. These cases stand for an entirely different proposition. They address one method of pleading the necessary mental state for fraud, not a general limitation on all methods of proving that mental state. A plaintiff can allege the necessary mental state "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Chill*, 101 F.3d at 267 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). *Chill* and *Stamelman* address how precisely motive must be alleged *in cases where motive and opportunity form the only grounds for alleging intent*. Here the plaintiffs have alleged, and provided evidence of, fraudulent intent based on strong circumstantial evidence, not a bare showing of motive and an opportunity to commit fraud.

to argue that Virola and Edwards's failure to take such steps rendered their reliance on XO's representations unjustifiable, such a conclusion is not required as a matter of law. *See Hyosung Am., Inc. v. Sumagh Textile Co., Ltd.*, 137 F.3d 75, 78-79 (2d Cir. 1998) (reversing grant of summary judgment to the defendant where the plaintiff was not "placed on guard or practically faced with the facts as a matter of law" and lacked the means to become aware of the facts by ordinary measures (internal quotation marks omitted)). The defendants in their memorandum of law state that Virola and Edwards "had the means to inquire through the use of public information" into the veracity of XO's representations without so much as hinting what those means might be. Defs.' Mem. Supp. Summ. J. 47. A reasonable jury could find that Virola and Edwards performed enough research to render their reliance justifiable.

4.      *Injury*

Under New York law, damages for claims of fraud and fraudulent inducement are subject to the "out-of-pocket rule," which confines plaintiffs to recovering losses actually sustained instead of expected profits. *See, e.g.*, *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421 (1996) ("Damages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained. Under the out-of-pocket rule, there can be no recovery of profits which would have been realized in the absence of fraud."). The Second Circuit takes a rather flexible approach to the out-of-pocket rule, permitting compensation for foregone economic opportunities such as lost career development. *See Stewart v. Jackson & Nash*, 976 F.2d 86, 88 (2d Cir. 1992) (allowing a claim for fraud to proceed based on damage to the plaintiff's career development caused by fraudulent inducement to work for a firm with no real work in her practice area); *Doelha v. Wathne Ltd.,*

*Inc.*, No. 98-CV-6087 (CSH), 2000 WL 987280, *7 (S.D.N.Y. July 17, 2000) ("If the proof is there, a defrauded plaintiff may base a claim for actual pecuniary loss upon an economic opportunity that the defendant fraudulently induced him to forego."). However, damages may not be recovered unless they can be ascertained with reasonable certainty. *See, e.g.*, *Allard v. Arthur Andersen & Co. (USA)*, 924 F. Supp. 488 (S.D.N.Y. 1996) ("[P]laintiffs may recover only "out of pocket" damages that can be ascertained with reasonable certainty.").

The plaintiffs claim to have suffered two types of damages as a result of their reliance on XO's misrepresentations. One is the commissions lost on sales not consummated due to XO's failure to operate its own lit fiber network. The other is the foregone earnings from other jobs they would have taken if they had not been fraudulently induced to accept employment with XO.

Lost commissions due to sales thwarted by XO's failure to operate its own lit fiber network are clearly nonrecoverable. The plaintiffs are correct to say that any such losses, if proved, are "commissions they would have earned, if XO's representation regarding the status of the OC-192 network were true." Pls.' Mem. Opp. Summ. J. 21. But the purpose of damages in a fraud action is not to put the plaintiff in the position she would have been in if the fraudulent representations were *true* -- if it were, courts would award the value of the Brooklyn Bridge in damages. Rather, the purpose is to put the plaintiff in the position she would have been in if the fraudulent representations were *not made*. Accordingly, calculating the amount of commissions the plaintiffs would have earned had XO in fact owned an intercity lit fiber network is beside the point.

However, if a reasonable jury can find that the plaintiffs forwent valuable

31

employment opportunities due to XO's misrepresentations, and can ascertain these damages with reasonable certainty, the plaintiffs' fraudulent inducement claim can survive summary judgment. Virola claims that she was informed by Band-X employee Joseph Care that she would receive a formal offer of employment from Band-X for a position with a base salary of $90,000.00 plus commission. Virola Cert. ¶ 5, 11. Edwards testified in her deposition that Universal Access employee Jerry Mattice actually offered a position with a base salary of $85,000.00 plus commission, and was told that she could earn upwards of $250,000.00 per year inclusive of commission and bonuses. Edwards Dep., Aug. 13, 2007, 243-45.

The defendants object to both of these statements as hearsay. The statement regarding each position's salary, since used to prove the position's salary, does not constitute a verbal act. Indeed, considering that the offers were not accepted, the offers themselves might arguably constitute hearsay. *See Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1087-88 (10th Cir. 2001) (holding that offers not resulting in a contract do not constitute verbal acts). However, if the plaintiffs cannot produce any alternative nonhearsay evidence of the salaries of these alleged positions before trial, Virola and Edwards' testimony regarding the offers and the salaries of those positions appear to be admissible under Rule 807's residual hearsay exception. Each such statement is clearly offered as evidence of a material fact, *see* Fed. R. Evid. 807(A), and would be more probative on that point than other reasonably available evidence if the plaintiffs cannot find other evidence, *see* Fed. R. Evid. 807(B).

The trustworthiness of an offer of employment and a salary quote, at least when given to an experienced professional, is circumstantially guaranteed by the powerful reputational pressures that a competitive labor market exerts on corporations. *See* Fed. R. Evid. 807

(requiring a statement introduced under the residual hearsay exception to have "equivalent circumstantial guarantees of trustworthiness" compared to statements admissible under Rule 803 and 804). Even with a legal presumption of at-will employment, a corporation that extends offers it does not intend to keep, or provides inaccurate salary quotes, will incur a negative reputation among prospective employees. While certainly not infallible, these market pressures provide circumstantial guarantees of trustworthiness that are equivalent to the assurances of reliability afforded by other hearsay exceptions. *Cf., e.g.*, Fed. R. Evid. 803(3) (authorizing use of a statement of a presently-existing mental state except a statement of memory or belief of a fact to prove that fact, and authorizing use of a statement of memory or belief of a fact to prove that fact when that fact relates to the execution, revocation, identification or terms of a declarant's will); Fed. R. Evid. 803(16) (authorizing use of statements in documents over twenty years old); Fed. R. Evid. 804(b)(4) (authorizing use of statements about family history if the declarant is unavailable). Finally, given that the plaintiffs will be subject to cross-examination as to whether the statements to them were actually made, and in what circumstances, the interest in ensuring that the plaintiffs' prospective employers did not deceive them regarding the terms of their offers or potential offers is minimal, and I find that the general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence. *See* Fed. R. Evid. 807(C).[25]

The testimony of Virola and Edwards regarding their offers or likely offers of

---

[25] As the parties did not specifically address the applicability of Rule 807 in their submissions, my determination that Rule 807 applies is without prejudice to reconsideration on a fully-briefed motion in limine. Additionally, admission of such testimony is contingent on the plaintiffs' provision of the names and addresses of the declarants as required by Rule 807. Of course, the issue may be avoided by other proof at trial of the nature and terms of the offers of employment.

employment and potential salaries, or other competent evidence of those facts, will enable a reasonable jury to find that Virola and Edwards suffered reasonably ascertainable damages as a result of foregoing economically advantageous opportunities in reliance on XO's misrepresentations. The evidence that Virola did not receive a formal offer, that Universal Access promptly filed for bankruptcy, and that some of the salaries offered took the form of commissions presents issues for the jury, but does not warrant summary judgment.

## C.    *Gender Discrimination*

### 1.    *Disparate Treatment*

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a).[26] In order to prevail on a claim of discriminatory disparate treatment, a plaintiff must make out a *prima facie* case by showing (1) that she was a member of a protected class and (2) that she performed satisfactorily, but (3) that she suffered an adverse employment action (4) in circumstances giving rise to an inference of discrimination. *E.g.*, *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 767 (2d Cir. 2002). If the plaintiff makes out a *prima facie* case, "a presumption of discrimination arises and the burden shifts to the defendant to proffer some legitimate, nondiscriminatory reason for the adverse decision or action." *Id.* If this burden, which is a burden of production only, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993),

---

[26]    The standards that apply to NYHRL claims are identical to those applicable to Title VII claims. *Petrosino v. Bell Atl.*, 385 F.3d 210, 220 n.11 (2d Cir. 2004); *accord Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 n.3 (2004). Accordingly, I will analyze the gender discrimination and retaliation claims under the Title VII standards. The one exception is individual liability, which is available under NYHRL and not Title VII, and which I treat separately in Section D, *infra*.

is met, "the presumption of discrimination created by the prima facie case drops out of the analysis, and the defendant 'will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.'" *Mario*, 313 F.3d at 767 (quoting *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)).

Virola and Edwards are members of a protected class, *e.g.*, *Sweeney v. Research Found. of State Univ. of N.Y.*, 711 F.2d 1179, 1185 (2d Cir. 1983), and a jury could reasonably conclude they performed satisfactorily based upon their testimony. The defendants do not dispute that having an account transferred to another sales associate constitutes an adverse employment action, and given that the plaintiffs were compensated partly on commission, I find that a jury could reasonably conclude that Virola and Edwards suffered adverse employment actions when client accounts were transferred to other sales representatives. *See, e.g.*, *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) ("Employment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." (internal quotation marks and ellipsis omitted)). The defendants suggest that the account transfers were not based on discrimination, but a reasonable jury could find otherwise, based on evidence regarding the number of times the plaintiffs' accounts were transferred to male sales associates, Virola Dep., Dec. 19, 2006, 269-84, 286-91, 306-09, 328-29; Edwards Dep., Aug. 13, 2007, 327-31, 348-52, 357-61, 434-42; the plaintiffs' observations that male associates received more favorable treatment, Virola Dep., Sept. 21, 2006, 136-37; Virola Dep., Dec. 19, 2006, 309-11; Cruz's comments regarding a glass

ceiling and threats to retaliate for complaints of gender discrimination, Virola Dep., Dec. 19, 2006, 312-14; Zatuchni Cert. Ex. JJ; and Dwyer's email possibly referring to females having a worse commission structure than males, Zatuchni Cert. Ex. QQ.

The defendants have submitted sufficient evidence to meet their burden of production with respect to the transfer of the Pilosoft account. Martin Dep. 101-03. However, the evidence supporting an inference of discrimination, *supra*, is sufficient to warrant a reasonable jury in finding that even without the presumption of discrimination, the transfer of Pilosoft was discriminatory.

2.      *Hostile Work Environment*

Title VII's prohibition on discrimination by sex extends not merely to discrete adverse employment actions but also to sexual harassment that creates a sufficiently hostile work environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) ("[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment."). To survive summary judgment on a claim of sexual harassment through a hostile work environment, a plaintiff must "elicit evidence from which a reasonable trier of fact could conclude (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer." *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir. 2003) (internal quotation marks and brackets omitted).

i.      *Existence of a Hostile Work Environment*

The existence of a hostile work environment "has both an objective and a

subjective component: [T]he misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004) (internal quotation marks omitted). As "Title VII does not establish a 'general civility code' for the American workplace," *id.* at 223 (quoting *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)), actionable sexual harassment must be more severe or pervasive than mere "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct," unless the offensive conduct is "extremely serious," *Petrosino*, 385 F.3d at 223; *see also Oncale*, 523 U.S. at 81 (noting importance of distinguishing actionable discrimination from "ordinary socializing in the workplace -- such as male-on-male horseplay or intersexual flirtation").

While the defendants contest the subjective component of the hostile work environment, the plaintiffs' statements and medical records regarding their psychological states will enable a reasonable jury to find that both Virola and Edwards subjectively perceived their environment to be abusive. Virola Cert. ¶¶ 73-74, 79-81; Edwards Cert. ¶¶ 52-57; Zatuchni Cert. Exs. VV, WW.

Although the objective requirement of a hostile work environment claim is demanding, considered in its totality, the lengthy list of incidents alleged here is sufficient to allow a reasonable jury to conclude that the workplace was sufficiently abusive. The evidence of Mowery's behavior towards Virola, Virola Dep., Sept. 21, 2006, 68-69, 75-76, 117, 119-21, 129; Zatuchni Cert. Ex. JJ; of the general attitude of disrespect towards female sales associates and Cardella's comments in particular, Virola Dep., Sept. 21, 2006, 66-68, 85-86, 89; Zatuchni Cert. Exs. JJ, PP; of disparate treatment with respect to the payment of commissions and transfer of

accounts, *see* Section C.1, *supra*;[27] of sexist comments made towards coworkers Pagnozzi and Fitzmaurice, Virola Dep., Sept. 21, 2006, 20-21, 32-33; Zatuchni Cert. Exs. MM, EE; Mowery Dep. 56-57; Virola Cert. ¶¶ 42-50; Edwards Cert. ¶¶ 36-40,[28] and of repeated comments by Cruz alleging that women were disfavored in the office, Virola Dep., Dec. 19, 2006, 313-14; Zatuchni Cert. Ex. JJ, enables a reasonable jury to find that the office atmosphere was so toxic as to alter Virola's terms of employment based on her gender. While Edwards complains of substantially less sexually charged conduct by Mowery than does Virola, she does claim that he approached her and glared at her in a physically threatening manner. Edwards Cert. ¶¶ 49-50. Thus, for similar reasons to Virola, a reasonable jury could find that Edwards was also subject to a hostile work environment because of her gender.

ii.    *Vicarious Liability*

The second element of the hostile work employment claim considers whether the employer is fairly accountable for the creation of the hostile work environment. If a hostile work environment is created by nonsupervisory coworkers, the employer is liable only if it "knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Petrosino*, 385 F.3d at 225. Where a hostile work environment is created by a

---

[27]    Though disparate treatment can ground an independent Title VII claim if it rises to the level of an adverse employment action, lesser disparate treatment -- which a reasonable jury might find proven in this case -- is properly considered in evaluating the severity or pervasiveness of a claimed hostile work environment. *See, e.g.*, *Raniola v. Bratton*, 243 F.3d 610, 619, 621 (2d Cir. 2001) (considering disparate treatment in work assignments in evaluating hostile work environment claim).

[28]    Evidence of discrimination and hostility to coworkers such as Pagnozzi, Fitzmaurice, and -- in Edwards's case -- Virola "may be of limited probative value, but it cannot be ignored on summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir. 1997); *see also Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001) ("[E]vidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination."); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) ("Because the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other incidents of hostility in order for those incidents to support her claim.").

supervisor, the employer may escape liability by establishing, as an affirmative defense, (1) that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *accord Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). This affirmative defense is unavailable if the harassment culminated in a "tangible employment action." *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 808.

If the jury finds that a hostile work environment existed, the record provides ample grounds for it to find that it was caused by Mowery and/or Cruz, and to reject XO's proffered affirmative defense even if it finds that the harassment did not culminate in a tangible employment action. The defendant proffers evidence that it has a strict antidiscrimination policy prohibiting sexual harassment, Rea Cert. ¶¶ 4-6 & Ex. A; notes that the coworker Fitzmaurice complained of was terminated, Fitzmaurice Dep. 19, 85-87, 98-99; and argues that the plaintiffs initially made other complaints not regarding sexual harassment and thus were not afraid to make complaints. The jury will be entitled to consider this evidence, but the plaintiff's evidence of improper handling of Fitzmaurice's complaint by HR, Virola Dep., Sept. 21, 2006, 32-33; Virola Cert. ¶¶ 42-50; Edwards Cert. ¶ 36-40; of improper handling of Cox's email by HR, Zatuchni Cert. Exs. HH, II; of HR's unwillingness to allow them to complain of sexual harassment, Virola Dep., Sept. 21, 2006, 11-12; Edwards Dep., Sept. 19, 2006, 78; and of Cruz's repeated and unequivocal threats to fire Virola and Edwards for complaining of sexual harassment, Edwards Dep., Sept. 19, 2006, 96-99; Virola Dep., Sept. 21, 2006, 12-13, 30-31, 35-36, 99-100, will allow the jury to reasonably conclude that XO did not exercise reasonable care to prevent and promptly

correct any such behavior or that the plaintiffs did not unreasonably fail to take advantage of any preventive or corrective opportunities.

iii. *Constructive Discharge*

Edwards claims that the hostile work environment to which she was subject constituted constructive discharge. This claim is essentially an aggravated hostile work environment claim, *Penn. State Police v. Suders*, 542 U.S. 129, 146 (2004), and is established "when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily," *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996), by creating conditions "'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign,'" *id.* (internal quotation marks omitted).

In the absence of Edwards's allegations that Mowery approached and glared at her in a physically threatening manner and her testimony and medical records indicating she suffered a stress-induced blood clot and was advised by her physician not to return to work, *see Section* C.2.i, *supra*, her allegations might fall short of the high threshold of severity required for a constructive discharge claim. However, on this record a reasonable jury could find that the hostile work environment became so intolerable that a reasonable person in Edwards's position would have felt compelled to resign.[29]

D. *Individual Liability*

The NYHRL provides for individual liability for aiders and abettors of unlawful

---

[29] When a constructive discharge is not caused by an official act, the employer will be able to invoke the *Ellerth*/*Faragher* affirmative defense, but for the reasons stated in Section C.2.ii, *supra*, a reasonable jury could find this defense inapplicable.

discrimination.  N.Y. Exec. Law § 296(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, [*i.e.*, the NYHRL] or to attempt to do so.").  The New York Court of Appeals has construed this provision to cover an employee who has an "ownership interest or any power to do more than carry out the personnel decision made by others." *Patrowich v. Chemical Bank*, 483 N.Y.S.2d 659, 660 (1984).  The Second Circuit has interpreted § 296(6) to provide liability for "a defendant who actually participates in the conduct giving rise to a discrimination claim" even in the absence of an ownership interest or the power to make independent personnel decisions. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Ellerth*, 524 U.S. 742.  An individual may not be held liable, however, merely for aiding and abetting his own discriminatory conduct but only for assisting another party in violating the NYHRL.  *E.g.*, *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 294 (E.D.N.Y. 1999); *Strauss v. N.Y. State Dep't of Educ.*, 805 N.Y.S.2d 704, 709 (3d Dep't 2005).

A reasonable jury could find that Mowery, Cruz, and Martin each aided and abetted other employees in subjecting Virola and Edwards to gender discrimination.  The evidence alleging Cruz and Mowery's contributions to the office's hostile work environment would, if credited, support a finding that each aided and abetted other employees' discriminatory behavior.  There is less evidence with respect to Martin, who did not even work at the same location as the plaintiffs, but the evidence that Martin was involved in the allegedly discriminatory removal of client accounts from the plaintiffs, Edwards Dep., Aug. 13, 2007, 327-36; Zatuchni Cert. Ex. SS, could lead a reasonable jury to conclude that he aided and abetted discriminatory behavior by other employees.

E.    *Intentional Infliction of Emotional Distress*

A claim for intentional infliction of emotional distress requires: "(1) extreme and outrageous conduct, (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001). This standard is "rigorous, and difficult to satisfy," and requires conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 122 (1993) (internal quotation marks omitted); *see also id.* ("[O]f the intentional infliction of emotional distress claims considered by this Court, every one has failed because the alleged conduct was not sufficiently outrageous.").

Judged against this standard, it is clear that Edwards's claim fails. New York courts do not, as a rule, extend the tort of intentional infliction of emotional distress to employment discrimination claims, *see, e.g.*, *Russo-Lubrano v. Brooklyn Fed. Sav. Bank*, No. 06-CV-672 (CPS), 2007 WL 121431, at *6-*7 (E.D.N.Y. Jan. 12, 2007) (citing cases), and no reasonable jury could find that the conduct involving Edwards was so extraordinary as to justify finding for Edwards on this tort.

CONCLUSION

For the reasons stated above, the defendants' motion is granted with respect to Virola's claim for retaliatory termination and both plaintiffs' claim for intentional infliction of emotional distress, but denied with respect to the remainder of the plaintiffs' claims. The final pretrial conference will be held on May 5, 2008 at 11:30 AM, and jury selection and trial will

take place on May 12, 2008 at 9:30 AM in Courtroom 6C South.

                                        So ordered.


                                        John Gleeson, U.S.D.J.

Dated:  April 15, 2008
        Brooklyn, New York